In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-14-00240-CR**
_____

**JESSIE HAYNES, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the County Court at Law No. 3**
**Jefferson County, Texas**
**Trial Cause No. 299967**

**MEMORANDUM OPINION**

Appellant Jessie Haynes (Haynes) was charged by information for the offense of obstructing a passageway, a Class B misdemeanor. *See* Tex. Penal Code Ann. § 42.03 (West 2011). Haynes entered a plea of "[n]ot guilty." The jury found Appellant guilty of the offense of obstructing a passageway. Haynes elected to have the trial court assess her punishment. The court sentenced Appellant to ninety days' confinement in jail, probated that sentence for a period of two years, and

assessed a two thousand dollar fine. The trial court considered and granted Haynes' request for community supervision. The trial court entered a Nunc Pro Tunc dated May 22, 2014, correcting the probation order. And, the trial court certified Haynes had a right to appeal. After filing her Notice of Appeal, Haynes filed a Motion for New Trial and Motion In Arrest of Judgment with the trial court, which the trial court denied.

Haynes raises five issues on appeal. First, she argues the evidence is legally insufficient to sustain her conviction for obstruction of a passageway. Second, she contends that she received ineffective assistance from trial counsel. Third, she argues that the trial court abused its discretion in denying her motion for new trial. Fourth, Haynes argues that reversible error occurred when the State was allowed to engage in prejudicial argument, thereby denying her a fair trial. And, in her fifth issue, Haynes contends that the State improperly introduced evidence about Haynes' character. We affirm.

UNDERLYING FACTS

Testimony of Michael Neil

Michael Scott Neil (Neil) testified that he was a board member of the Beaumont Independent School District (BISD). Jessie Haynes was employed by the BISD, and she had the title of "Special Assistant to the Superintendent," and,

2

according to Neil, she was "over the communications -- the Communications Department[]" for BISD. Neil testified that, as the communications director, Haynes dealt with the media, public relations, and communications, and Haynes had no authority over the school board members like Neil.

Neil testified that on August 1, 2013, the BISD school board conducted a special meeting at the BISD administration building in Beaumont, Texas. Neil explained that at the time of the meeting, the BISD and several individuals were engaged in litigation regarding redistricting. Neil recalled that on the day of the meeting, there had been some rulings from the Texas Education Agency or the courts, and he described the meetings as "boiling and boiling more and more." According to Neil, the public had access to the school board meeting that evening, except when the board entered executive session. Neil agreed that the board meetings were monitored by the BISD campus uniformed police. Referencing a diagram of the administration building's floorplan that was offered and admitted into evidence as State's Exhibit 1, Neil described the location of the boardroom and the meetings. He explained that the school board met in the boardroom and the executive sessions were held in a side room, both located in the BISD administration building. He stated that most people would enter through the main entrance and proceed down a hallway that would take them to the boardroom. Neil

3

testified that he had never known there to be any restrictions placed on that hallway. Neil agreed that the double doors to the boardroom would close the hallway, however he testified that he had never known the doors to be locked and he recalled the doors were always open. According to Neil, even if the area had been closed to the general public, it would not have been closed to him as a BISD trustee:

> [State's attorney]: To the best of your knowledge, that public -- that hallway has always been an accessible place for the public and that's evidenced, in your opinion, by what factors?
>
> [Neil]: Well, first of all, it's never been closed. Another factor is several months before then when there was, I think, a decision made that the public couldn't bring drinks in to the boardroom, that the [] then President Woodrow Reese let people know if they needed something to drink there was a water fountain down the hall. There was [sic] drink machines in the cafeteria which was an obvious indication that it's not closed off to the public.
>
> [State's attorney]: And when persons weren't allowed to bring a drink into the boardroom, obviously at times of recess, everybody would go get a glass of water or Coke or something and mill about that hallway?
>
> [Neil]: Well, there wasn't a lot of milling about but there was access down there. There's also -- the two restrooms right off the boardroom are very small. There's also another set of restrooms down that hallway across -- about across from the cafeteria. So, it's not unusual to have someone down that hall.

Neil testified that on the evening in question, after the executive session had adjourned, it came to his attention that something was going on in the hallway and

4

that he might be needed in the hallway. Neil testified that he then proceeded out of the boardroom and down the hallway. He further explained to the jury:

> I had heard that there was a meeting with the media and that they were not allowing a certain journalist in the meeting. And so they asked me to, I guess, come check -- I'm not sure what exactly they asked me to do but I knew there had been an ongoing situation between Ms. Haynes and this person with the media, him being left out of media things, not being on certain e-mail lists, stuff like that. So, that's when I went and asked Ms. Haynes why he wasn't being allowed to be in the press conference or whatever they were calling it at the time.

Neil understood that the press conference or media event was occurring down the hallway on the other side of the doors located in the hallway. According to Neil, when he arrived he encountered Jessie Haynes along with reporter Jerry Jordan and attorney Michael Getz at the closed doorway. Neil testified that Haynes was standing directly in front of the doors and blocking Jerry Jordan from access through the doors to the media event. Neil explained that he asked Haynes why she was not allowing Jordan to go through the doors and that Neil then reached around behind Haynes for the handle on one of the doors. According to Neil, it was apparent to him that Haynes was not going to move to let him or Jordan through the door. The incident in the hallway was captured by video and audio recordings, and the recordings were offered and admitted (without objection) into evidence as State's Exhibits 9 and 10, and then played for the jury.

5

Testimony of Sergeant Delco

BISD Police Sergeant Aqua Delco (Delco or Sgt. Delco) also testified at trial. Sgt. Delco testified that she regularly attends the BISD board meetings, and she and other officers provide security at the meetings. Sgt. Delco stated that, on the evening in question, she was at the BISD administration building to provide security. Delco explained that at one point she was told there was going to be a press conference, and the BISD attorney, Melody Chappell, told Sgt. Delco that Chappell preferred that Jordan "not be allowed to attend" the press conference, although Chappell did not give the officer a specific instruction to keep Jordan out. Sgt. Delco stated that when the board meeting adjourned, she saw Jordan and told him that Ms. Chappell preferred that he not attend the press conference. Sgt. Delco said that initially Jordan left but he later returned. According to Sgt. Delco, she and Haynes were standing on the side of the doors that are in the hallway, and Sgt. Delco told Jordan he was not welcome, and then Sgt. Delco went into the conference. At that point, Sgt. Delco testified that Haynes and Jordan were on the other side of the doors. Sgt. Delco agreed that it was a public passageway and a public doorway:

> [State's attorney]: But it's in a public building. That's a public passageway in that public building. That's a public doorway. It was a public press conference that everyone should have been allowed to attend. Do you agree with me on that?

6

[Sgt. Delco]: Yes, ma'am.

[State's attorney]: And you agree that Mr. Jordan, whether or not he is liked or loathed, has a First Amendment right to attend a press conference if that's what Ms. Chappell was holding? Whether titled it a press conference or an interview, she was clearly discussing something with members of the media; correct?

[Sgt. Delco]: Correct.

[State's attorney]: And -- and he clearly should have been allowed behind those doors; correct?

[Sgt. Delco]: He could have been.

[State's attorney]: Maybe you shouldn't have blocked those doors either?

[Sgt. Delco]: I -- well, I didn't block the door. I blocked Jerry Jordan.

[State's attorney]: But do you clearly see Ms. Haynes blocking the door itself? Do you see a difference between you[] asking Mr. Jordan or even telling him, "No, you're not invited to the press conference["] and what Ms. Haynes did[]?

[Sgt. Delco]: Yes, ma'am.

[State's attorney]: And what is the difference?

[Sgt. Delco]: My access was just to Jerry, not to anybody else to block access.

[State's attorney]: Would you have blocked Mr. Mike Neil, board trustee, from going through that door? Would you have blocked him, as a sergeant?

[Sgt. Delco]: No, ma'am.

7

Testimony of Jerry Jordan

Jerry Jordan (Jordan) testified that he is an "investigative reporter with setinvestigates.com[,]" and that he has covered BISD meetings as a citizen and as a reporter for about twenty-six years. Jordan testified that he attended the BISD board meeting that night as a reporter and that he had previously attended many other meetings in the past. According to Jordan, he had never previously been denied access to a press conference. He explained that he felt he should not have been prevented from reporting on the events that occurred that night. According to Jordan, Sgt. Delco stepped into the conference and Haynes blocked the doorway:

> [State's attorney]: At some point did Ms. Delco or Sergeant Delco step into the press conference behind the closed doors?
>
> [Jordan]: Yes, she did.
>
> [State's attorney]: And at that point you were not allowed in still?
>
> [Jordan]: No, I was not.
>
> [State's attorney]: And what did Ms. Haynes do?
>
> [Jordan]: She blocked the doorway.

At trial, Jordan identified the defendant as Haynes and as the person who blocked the doorway.

Testimony of Corporal Juan San Miguel

Officer Juan San Miguel (San Miguel), a corporal in the BISD police department, also testified. San Miguel testified that he did not personally observe the incident, but he was inside the boardroom when Ms. Haynes came in and told him she wanted to file charges against Michael Neil for assaulting her:

> [State's counsel]: Can you relate for the jury when it is that you became involved in what has led us here today?
>
> [San Miguel]: I was in the boardroom when Ms. Haynes walked in -- walked back, I guess, from the hallway and said, "Officer, I need to file charges on someone for assaulting me. Mike Neil."
>
>     . . . .
>
> [State's counsel]: What happened next?
>
> [San Miguel]: She asked me to follow her into the hallway because she wanted to show me where the incident occurred.
>
> [State's counsel]: How did she appear in her demeanor? Did she appear to you that she had just been assaulted?
>
> [San Miguel]: She didn't appear to be, like, in pain or hurt or real upset but she -- you could tell she wasn't happy.
>
> [State's counsel]: Based upon your experience as a police officer, when someone makes a claim to you that they have been assaulted, you know what it is that you need to look for; correct?
>
> [San Miguel]: Yes.
>
> [State's counsel]: And did you see any of those factors in Ms. Haynes?

9

[San Miguel]: No.

San Miguel further explained that he followed Haynes outside into the hall and obtained more information, observed that there were cameras in the hallway, and later prepared a report. After refreshing his memory with the copy of the report that he prepared, San Miguel testified as follows about what Haynes told him:

> [State's attorney]: What did Ms. Haynes specifically state to you in reference to any alleged assault that occurred first involving Mr. Mike Neil?
>
> [San Miguel]: That he grabbed her by the shoulders and pushed her down.
>
> [State's attorney]: Okay. And then did she also report a few moments later that she was assaulted by Jerry Jordan?
>
> [San Miguel]: Yes.

According to San Miguel, he investigated the allegations made by Haynes and he obtained and viewed the video of the incident. The video recording was displayed to the jury. After the video was displayed, the State asked San Miguel about what he observed on the video:

> [State's attorney]: I'm asking you your opinion as a police officer. Did you see him grab her by the shoulders and throw her down?
>
> [San Miguel]: No, ma'am.
>
> [State's attorney]: Did you see her obstruct him from entering that doorway?

10

[San Miguel]: Yes, ma'am.

[State's attorney]: And you're familiar with the law. You're familiar with Texas Penal Code 42.03. In fact, I believe in our conversation earlier you told me that you've actually filed an obstruction case yourself; right?

[San Miguel]: Yes, ma'am.

[State's attorney]: You're familiar with the elements of that offense.

[San Miguel]: Yes, ma'am.

[State's attorney]: And does it require that an individual obstruct a passageway that's open to the public or a substantial group thereof?

[Defense Attorney]: Excuse me. Objection. She's asking a legal information -- legal conclusion.

[State's Attorney]: Your Honor, may I respond?

THE COURT: Go ahead.

[State's Attorney]: I'm simply asking him a question as a peace officer who stated that he has filed the charge under 42.03 previously. I'm asking if he is familiar with the code.

THE COURT: You can answer if you're familiar with the code, but do not give a legal opinion in this case. All right?
    Do you understand what I just said?

[San Miguel]: Yes, sir. Yes, sir.

THE COURT: You can answer as to your familiarity with the code, but do not give a legal opinion in this particular case.

[San Miguel]: Yes, Your Honor.

11

THE COURT: Go ahead.

. . . .

[State's attorney]: If an individual were to stand in front of those doorways and prevent access from either a reporter or a trustee by standing in front of and physically blocking those doorways, would they be obstructing that passageway?

[San Miguel]: Yes, ma'am.

[State's attorney]: Did you observe Ms. Haynes on that video to do that?

[San Miguel]: Yes, ma'am.

. . . .

[State's attorney]: And, in fact, Corporal, Mr. Neil would not even have had to have been denied full access. It was -- [] full passageway through there. It was even being denied access. There's no requirement that he actually had to have been prevented from going on through the door; correct? Is that your understanding?

[Defense Attorney]: Again, objection. She's asking a legal conclusion.

. . . .

THE COURT: No, what I'll do, again, is that any personal information you have or your observations you can answer that particular question based upon your training and experience. However, do not give a legal opinion in this particular case. All right.

Testimony of The State's Other Witnesses

Michael Getz (Getz), a self-employed attorney, who has been involved in

litigation with the BISD, and who in his capacity as an attorney also represents

12

Jerry Jordan, also testified at trial. Getz explained that the doors in the hallway in question were typically open for public access and that the water fountain, cafeteria, restrooms, and memorabilia are all located within that hallway. Another citizen, Pamela Shelander (Shelander), testified she attended school board meetings at the administration building, she was familiar with the area, she has never been prevented access, and the hallway is always open to her as a member of the general public. Shelander stated that she had never seen the doors closed before.

Testimony of Melody Chappell

Melody Chappell (Chappell), an attorney for the BISD, testified on behalf of the defense. Chappell explained to the jury that the hallway in question was not open to the public, and further that at the time of the incident, the BISD board meeting had already concluded. Chappell testified that after the board meeting she granted some reporters an interview, but not Jerry Jordan. According to Chappell, neither school board member Neil nor the public had the right to access that part of the building after the board meeting concluded. Chappell explained it to the jury as follows:

> During a board meeting they will let them go down that hall. I think I said that. Because sometimes the rest rooms -- well, they're small; and there are only two in there. So, particularly when we're taking a break between regular session and executive session, we're

all rushing that way so we do go down that hall. But after school board meetings, no, ma'am, the police officers corral everyone to leave because we're all trying to get out of there. And we can't leave until everyone leaves. So -- I say ''we," but I can leave. But, you know, they want everyone gone. So, they do not let people down that hallway, no.

Chappell testified that after the board meeting ended, Chappell met with the board in executive session, and the public and press are not allowed access during an executive session. Chappell recalled that earlier in the day and before the board meeting, a court opinion had been issued relating to redistricting. After the executive session was concluded, she remained in the hallway to meet with other BISD attorneys and to talk to the superintendent. Ron Reynolds, also with the BISD Communications Department, asked Chappell to speak to two reporters from two television stations and she agreed to answer their questions. Ms. Chappell testified that she did not consider the interview to be a press conference and that it is her position that she had the right to decide who does or does not interview her. According to Chappell, earlier that evening she had an encounter with reporter Jerry Jordan and she was not going to talk to him:

> [Defense attorney]: I want you to tell me the first time that you encountered him on August 1.
>
> [Chappell]: I don't know if it was the first time I encountered him. I probably saw him at that meeting and, you know, he usually speaks. You know, he tries to have a rapport; and I think he does that with everybody. So, I probably spoke to him; but I don't talk to him a

14

whole conversation. He may talk to me. It's kind of yeah, you know, friendly. But after the executive session I walked out and he was standing at the door and we have had instances with him trying to come in executive session but he tends to stand at the door. They stopped that now, but at this point he was at the door. One of the news cameramen were sitting -- was sitting down and I don't remember who it was but from one of the TV stations and Mr. Jordan's talking to him.

Chappell testified that Jordan then made a derogatory comment to the cameraman which she overheard and that she believed to be directed at her. According to Chappell she walked away, but it was the first time Jordan had "disrespected" her in that manner. She also stated that Jordan, Getz, Neil, and others would sometimes "get rude." According to Chappell, she decided to treat Jordan the same way she treats Neil and Getz, and she was "not going to talk to him." Chappell told Ron Reynolds she would talk to reporters from the two TV stations but that she would not talk to Jordan. According to Chappell, while the press was setting up for the interview with reporters, Jordan came through the doors and Ron Reynolds told Jordan he could not enter. Chappell testified that

> . . . [Jordan] screamed . . . "Well, you're a member of the public and you're going to talk to me. I'm a member of the press and you're going to talk to me." And I screamed back, "No, I'm not. I'm not a public person and I can talk to whoever I want to talk to and I'm not talking to you."

15

Chappell testified that people are excluded from coming through that hallway during an interview with a television reporter. Chappell explained that school board members do not maintain offices in the administration building, they do not have the right to enter the building after hours, and they do not have keys or access codes to the building. However, according to Chappell, as an employee of the district, Haynes would have those rights to the extent it was in the exercise of her job duties for the BISD.

Chappell also testified about the contents of Defense Exhibits 18 and 19 and the video recordings of what happened that day. The exhibits were published to the jury. Chappell testified that she gave no instructions for Michael Neil to be excluded, and she did not remember talking to Sgt. Delco. According to Chappell, Haynes was not acting on Chappell's authority or at Chappell's direction, and Chappell stated that she did not give any instructions to Haynes that evening.

On cross-examination, Chappell disagreed that the First Amendment would give Jordan the right to be in the interview with the press, stating as follows:

> [The] First Amendment doesn't give him the right to be there. [The] First Amendment gives him the right to say what he wants to say, print what he wants to say. But, I mean, he was escorted out because he was disturbing the interview. He was yelling and arguing. That's the only reason why Officer Delco -- it caught her attention. He was in the room. Mr. Reynolds was telling him that I was not going to answer any questions for him. And he was escorted out because he started yelling because he decided that if I wasn't going to answer any

16

questions for him, he was going to disrupt it. He wasn't going to let it happen. And he is taking pictures and he is yelling at me and it was disruptive. I didn't ask him to leave. I just said I'm not going to talk to you, and I wasn't going to talk to him.

The State also asked Chappell about the claim that Haynes filed wherein Haynes claimed to have been assaulted during the incident. Chappell explained that after the incident, Haynes made a request for "assault leave" and that the BISD practice is that an employee who requests "assault leave" is placed on leave, and if a subsequent investigation finds no assault occurred, then the BISD would take the employee off assault leave, but BISD cannot reprimand the employee for asking for the leave.

Haynes did not testify at trial. Following arguments of counsel and deliberations, the jury found Appellant guilty of the offense of obstructing a passageway. After the presentation of punishment evidence, and after further argument of counsel, the Court sentenced Haynes to ninety days' confinement in jail, probated that sentence for a period of two years, and the court assessed a $2,000.00 dollar fine. Haynes timely filed a Notice of Appeal.

### OBSTRUCTING A PASSAGEWAY

Haynes was charged with obstructing a passageway under section 42.03(a)(1) of the Texas Penal Code, which reads as follows:

(a) A person commits an offense if, without legal privilege or authority, he intentionally, knowingly, or recklessly:

(1) obstructs a highway, street, sidewalk, railway, waterway, elevator, aisle, hallway, entrance, or exit to which the public or a substantial group of the public has access, or any other place used for the passage of persons, vehicles, or conveyances, regardless of the means of creating the obstruction and whether the obstruction arises from his acts alone or from his acts and the acts of others. . . .

Tex. Penal Code Ann. § 42.03(a)(1). The offense is a Class B misdemeanor. *Id.* § 42.03(c). The State had the burden to prove beyond a reasonable doubt that Haynes intentionally, knowingly, or recklessly obstructed (a) a highway, street, sidewalk, railway, waterway, elevator, aisle, hallway, entrance, or exit to which the public or a substantial group of the public has access, or (b) any other place used for the passage of persons, vehicles, or conveyances. *Id.* § 42.03(a)(1).

## LEGAL SUFFICIENCY OF THE EVIDENCE

In her first issue, Haynes argues that the evidence is "legally insufficient to sustain the conviction." She argues that the State failed to prove each essential element beyond a reasonable doubt. More specifically, she contends that the State failed to prove that Haynes blocked access to anyone other than Jordan, who did not have permission to go into the area, and Neil, who was a school board member and not a member of the public. Haynes argues that the evidence was legally insufficient to show that she obstructed "a hallway, entrance, []or exit to which the

18

public or a substantial group of the public had access." According to Haynes, simply because the public has access to an area at a given point in time does not mean it has access to the area at all times. Haynes maintains that after the school board meeting ended, the area of the hallway in question was no longer an area to which the public had access.

Legal and factual sufficiency challenges are reviewed under the standard articulated in *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). *See Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). In reviewing a sufficiency challenge to a criminal conviction, we view all the evidence in the light most favorable to the verdict. *Id.* at 899. Based on the evidence admitted during the trial, together with the reasonable inferences that are available from the evidence, we then determine whether a rational factfinder could have found the essential elements of the crime beyond a reasonable doubt. *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011). This standard allows the jury to weigh the evidence, to fairly resolve any conflicts in the testimony, and to draw reasonable inferences from the basic facts. *Id.* (citing *Jackson*, 443 U.S. at 319).

The evidence at trial consisted of not only testimony from witnesses but also video and audio recordings of the incident. Haynes does not challenge the video. She does not deny that she stood in front of the doors in the hallway and that she

19

refused to allow Jordan or Neil access. She argues that she did not obstruct a hallway, entrance, or exit to which the public or a substantial group of the public had access.

The testimony at trial established that the school board met in the boardroom, which was accessed by the hallway in question and that there was a water fountain, a cafeteria, vending machines, restrooms, and memorabilia in the hallway. The jury heard testimony from Michael Neil, BISD Sgt. Delco, BISD Cpl. San Miguel, Michael Getz, Pamela Shelander, and Melody Chappell. Each testified in some respect as to whether or not the public had access to the hallway.

According to Neil, he had never known the access to the hallway to be restricted or the doors to be closed during a BISD board meeting. Neil indicated that the public was given access to the restrooms, water fountains, and drink machines in the hallway and would come and go through the hallway. Neil further testified that the hallway was open to the public and that everyone had access to it and was welcome there. Sgt. Delco agreed that the area was a "public passageway." Reporter Jerry Jordan testified he had covered BISD meetings as a citizen and reporter for twenty-six years in the administration building, covering many events in that hallway. Attorney Michael Getz testified the doors were typically open as an area of public access and that the water fountain, cafeteria,

20

restrooms, and memorabilia are all located within that hallway. Getz indicated that he had been allowed access to and from that hallway on multiple occasions. Shelander, a citizen also in attendance at the board meeting that evening, testified that she had attended many school board meetings and that the hallway had always been open to the public. Cpl. San Miguel agreed that the hallway was considered to be open to the public "on a regular basis[.]"

On the other hand, Chappell testified that the hallway was not open to the public after the school board meeting adjourns. Chappell also testified that she had the right to grant an interview to some members of the press and exclude Jordan. Chappell stated that Jordan was "disruptive" and that he had made a comment that she overheard that was directed at her, and she decided she did not want to talk to Jordan. However, Chappell testified that she did not instruct Haynes to block Jordan or Neil from the interview with the press.

In reviewing a case where the issue is whether the evidence is sufficient to support a verdict, we are required to give the factfinder, in this case the jury, deference as to its responsibility to fairly resolve any conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from the facts admitted in the case at trial. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). We do not substitute our judgment for the factfinder's judgment. *Id.* Viewed

21

in the light most favorable to the verdict, we conclude that a rational jury could have found that Haynes intentionally, knowingly, or recklessly obstructed an aisle, hallway, entrance, or exit to which the public or a substantial group of the public has access. A rational jury could have found the essential elements of the offense beyond a reasonable doubt. Issue one is overruled.

INEFFECTIVE ASSISTANCE OF COUNSEL AND
DENIAL OF MOTION FOR NEW TRIAL

Haynes argues issues two and three together because both deal with her argument that she received ineffective assistance of counsel at trial. She argues that her retained attorney allowed witnesses to give "opinions as to Appellant's guilt, with no logical trial tactic to support same." She further argues that her trial attorney was ineffective for not calling BISD superintendent Dr. Timothy Chargois to testify when he was available and prepared to testify, and that he would have testified that the area was not open to the public. Haynes contends that the trial court erred in denying her motion for new trial, which was based in part upon the ineffectiveness of her trial counsel.

To prevail on a claim of ineffective assistance of counsel, an appellant must prove two elements by a preponderance of the evidence: (1) trial counsel's performance was deficient; and (2) harm resulted from that deficiency sufficient to undermine confidence in the outcome of the trial. *Strickland v. Washington*, 466

22

U.S. 668, 687, 694 (1984); *Ex parte LaHood*, 401 S.W.3d 45, 49-50 (Tex. Crim. App. 2013). An appellant's failure to make either of the required showings of deficient performance or sufficient prejudice defeats the claim of ineffective assistance. *Rylander v. State*, 101 S.W.3d 107, 110 (Tex. Crim. App. 2003); *see also Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009) ("An appellant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other prong.").

An ineffective assistance of counsel claim "must be 'firmly founded in the record' and 'the record must affirmatively demonstrate' the meritorious nature of the claim." *Menefield v. State*, 363 S.W.3d 591, 592 (Tex. Crim. App. 2012) (quoting *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005)). Ordinarily, the record on direct appeal is simply undeveloped and does not adequately reflect trial counsel's failings, especially when counsel's reasons for failing to do something do not appear in the record. *Menefield*, 363 S.W.3d at 592-93.

We indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance, and, therefore, an appellant must overcome the presumption that the challenged action constituted "sound trial strategy." *Strickland*, 466 U.S. at 689; *Williams*, 301 S.W.3d at 687. When the

record is silent, an appellate court may not speculate about why counsel acted as he did. *Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994); *Gamble v. State*, 916 S.W.2d 92, 93 (Tex. App.—Houston [1st Dist.] 1996, no pet.). Without testimony from trial counsel, the court must presume counsel had a plausible reason for his actions. *Gibbs v. State*, 7 S.W.3d 175, 179 (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd).

Haynes argues on appeal that her trial counsel should have objected to the testimony of witnesses who were "allowed to testify as to whether Appellant was guilty of the charged offense by testifying as to whether . . . Appellant had committed the elements required by the offense." She argues that no witness is competent to express an opinion as to guilt or innocence, citing generally to *Boyde v. State*, 513 S.W.2d 588 (Tex. Crim. App. 1974). According to Haynes, "[t]he record is replete" with examples of trial counsel's failure to object to "impermissible testimony[.]"

A witness may testify to his perceptions of events that the witness personally observed or experienced. *See Williams v. State*, 402 S.W.3d 425, 437 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd) (citing *Fairow v. State*, 943 S.W.2d 895, 898 (Tex. Crim. App. 1997)). Perceptions include a witness's interpretation of information acquired through his or her senses or experiences at the time of the

24

event. *See Osbourn v. State*, 92 S.W.3d 531, 535 (Tex. Crim. App. 2002). Such testimony can include opinions, beliefs, or inferences as long as they are drawn from the witness's own experiences or observations. *Id.*

Haynes argues that "[n]umerous witnesses for the State were allowed to testify as to whether Appellant was guilty of the charged offense" by giving their opinion as to whether the appellant committed the elements required of the offense. She then globally cites to several areas in the appellate record that pertain to portions of the testimony provided by Michael Neil, Jerry Jordan, Michael Getz, Sgt. Delco, Pamela Shelander, and Cpl. San Miguel. We disagree with her characterization that the testimony provided by the witnesses in question was "impermissible."

With respect to the testimony of Cpl. San Miguel, Haynes' trial attorney made objections to some of the questions of the officer, and the trial court sustained the objections and instructed the witness he could not give a legal opinion. As to witnesses, Neil, Jordan, Getz, Delco, and Shelander, the State did not ask the witnesses to give an opinion as to whether or not they felt Haynes was guilty of the offense for which she was charged. However, the State did elicit testimony from such witnesses regarding the hallway, the public's access to the hallway, and about their experiences and items they observed. Accordingly, the

25

questioning of each of these witnesses regarding the public's access to the hallway or their own recollection of the events in question did not constitute "impermissible" testimony.

Next, Haynes contends her trial attorney was ineffective for failing to call Dr. Timothy Chargois, the Superintendent for the BISD, as a witness. Haynes argues Chargois would have testified and provided "exculpatory" evidence for the jury and would have stated that the hallway in question was not open to the public and that "[Haynes] was acting within her authority[.]" Haynes also contends that the trial court erred in failing to grant her motion for new trial, which she filed after the trial and to which she attached an affidavit from Chargois. Nothing in the record shows why trial counsel did not call Chargois as a witness, nor is there any indication that Chargois would have provided evidence that would have changed the outcome of the trial. Because the record is silent regarding the strategy or decisions of trial counsel, we may not speculate as to why the trial counsel did not call Chargois as a witness at the trial. *See Jackson*, 877 S.W.2d at, 771; *see also State v. Thomas*, 428 S.W.3d 99, 107 (Tex. Crim. App. 2014) (The failure of defense trial counsel to call a potentially exculpatory witness who was available at trial and known to the defense is not, by itself, a valid legal claim that is sufficient to grant a motion for new trial.). Haynes has also failed to establish that but for

26

counsel's alleged errors the result of the trial would have been different. *Strickland*, 466 U.S. at 694.

On the record before us, we cannot say that trial counsel was ineffective, and we cannot say that the trial court abused its discretion in denying the motion for new trial. *Estrada v. State*, 313 S.W.3d 274, 311 (Tex. Crim. App. 2010) (deciding the record was insufficient to address ineffective assistance of counsel claims where it did not sufficiently show that counsel's representation was deficient as to tactical and strategic decisions); *see also Salazar v. State*, 38 S.W.3d 141, 148 (Tex. Crim. App. 2001) (a trial court does not abuse its discretion in denying a motion for new trial provided its decision is not arbitrary or unreasonable). We overrule issues two and three.

PREJUDICIAL JURY ARGUMENT

In her fourth issue Haynes complains that the State was allowed to engage in prejudicial jury argument which denied Haynes a fair trial. More specifically she complains about the following statements made by the State's attorney during closing argument:

> . . . Notice [Chappell] doesn't even flinch over Jessie Haynes obviously lying about assaults that never took place on that videotape and about lying about her injuries to the point where she wants to get paid leave. All [Chappell] says is with a smile on her face, 'Hey, she asked for it. It's the law. We've got to give it.' Not one single word about advising that board or about saying, 'Hey, guys, we need to

27

fight this kind of crap because this is corruption at the worst level.' 'Just pay the lady.' That's basically what she said. That's fraud. And I'm not accusing her of it. I'm just saying she didn't flinch. She just says, 'We've got to pay her." No big deal.

That's the problem. Nobody wants to fight for the kids. Truth be damned. It's irrelevant.

. . . .

. . . This is a joke to [Haynes]. And because of it, the school board's becoming a joke and I'm sick and tired of it. . . . So, hello, Jessie Haynes, because the whole thing from top to bottom tells her she can get away with this all she wants.

. . . .

This is a joke to these people. This isn't about hurting her personally. It's about administering some discipline here like we do with our children, holding her accountable for juvenile behavior; and it's only you that can do that. You have to take the first step so that she will sit in class, do her job, and behave herself or go somewhere else so that the other little misbehaving juveniles at B.I.S.D. will take notes, sit down, pay attention, and behave themselves or like in this case that only you can start with, there will be or not be consequences. There will be consequences, and to the rest of that board there will be consequences.

. . . .

Gentlemen, it's time to begin the process of holding B.I.S.D. and its administrators accountable for their actions and the first step in doing that is holding Ms. Haynes accountable for her actions. You send a message to this community by your verdict that the corruption and the cover-ups will be tolerated no more. By holding Jessie Haynes accountable for her actions, you send that message.

. . . .

28

The cover-ups and the corruption have got to stop. If you find her not guilty, that cover that just came off the cover-up goes right back on. It's time, gentlemen, to begin the process of holding B.I.S.D. and its administrators, including Ms. Haynes, accountable for their actions. We have to do that to take the first step in healing the divide in our community that we talked about on Monday, the divide that's come as a result at the hands of the constant dysfunction and childlike behavior, bickering politics, that B.I.S.D. has become. It's time for B.I.S.D. and its employees to realize that they don't get to play by a different set of rules. They play by the same rules that you do and the same rules that I do.

. . . .

I ask you who agrees with the law? Why do we have the law? Because we want things open. We want transparency. I ask you gentlemen to make certain that from this day forward every passageway, both literally and figuratively, will be open to all of us and to all of our kids and that nobody be shut out from the truth. Send a message to B.I.S.D., send a message to its administrators, and send a message to Ms. Jessie Haynes and our community as a whole that we will not allow them to close any more doors. We will not allow them to obstruct us from the truth any longer. Do not allow those childish ways, self-motivated, self-serving individuals that have caused this bickering to prevail any longer. Open up the doors, open up the hallways, open up the truth. Let transparency come in and by your guilty verdict send a message to this community that justice is done.

"The law provides for, and presumes, a fair trial free from improper argument by the State." *Thompson v. State*, 89 S.W.3d 843, 850 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd) (citing *Long v. State*, 823 S.W.2d 259, 267 (Tex. Crim. App. 1991) (en banc)). "[P]roper jury argument generally falls within one of four general areas: (1) summation of the evidence; (2) reasonable deduction

29

from the evidence; (3) answer to argument of opposing counsel; and (4) plea for law enforcement." *Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2008). A prosecutor may argue his opinion concerning a witness's credibility or the truth of witness's testimony only if the opinion is based on reasonable deductions from the evidence and does not constitute unsworn testimony. *See McKay v. State*, 707 S.W.2d 23, 37 (Tex. Crim. App. 1985) (en banc). Wide latitude is allowed in drawing inferences from the evidence, so long as the inferences drawn are reasonable, fair, legitimate, and offered in good faith. *Gaddis v. State*, 753 S.W.2d 396, 398 (Tex. Crim. App. 1988). In examining challenges to a jury argument, a court considers the remark in the context in which it appears. *Id.*

A party may present on appeal a complaint about an improper jury argument only if the record shows that (1) she timely and properly objected to the trial court and (2) the trial court (a) overruled the objection, either expressly or implicitly, or (b) refused to rule on the objection, and the party objected to the refusal. Tex. R. App. P. 33.1(a); *Gutierrez v. State*, 36 S.W.3d 509, 510-11 (Tex. Crim. App. 2001); *Cockrell v. State*, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996) (en banc). The Texas Court of Criminal Appeals has made clear that a defendant's failure to object to improper jury argument forfeits the right to complain about the argument

on appeal. *See Threadgill v. State*, 146 S.W.3d 654, 667, 670 (Tex. Crim. App. 2004).

Haynes did not object to any part of the State's argument at trial. Accordingly, we need not determine whether the complained-of argument exceeded the scope of proper argument because Haynes did not preserve this complaint for appeal. *See* Tex. R. App. P. 33.1(a). We overrule issue four.

### PLACING HAYNES' CHARACTER IN ISSUE AND BEING TRIED FOR OTHER CONDUCT

In Haynes' fifth issue, she contends that the State improperly introduced evidence about Haynes' character. Haynes argues that evidence of a person's character is not admissible to show simply that she acted in conformity therewith. She argues that the State was "allowed to present testimony *ad nauseam* to the jury of Appellant's alleged character. However, Appellant had not, and did not, place her character into evidence at any time." She contends that the State produced testimony before the jury about Haynes, including her medical records and her claim seeking "assault leave," and her claim that she was injured in this incident. Haynes argues that she was not on trial for making a false claim of being the victim of an assault, and she was not making a claim before the jury that she exercised self-defense.

The Texas Rules of Evidence prohibit the use of extraneous offense evidence to prove character conformity. *See* Tex. R. Evid. 404(b). However, such evidence may be admissible if it has relevance apart from character conformity. *Id.*; *Montgomery v. State*, 810 S.W.2d 372, 377 (Tex. Crim. App. 1990) (op. on reh'g). For example, evidence that logically serves as proof of "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or lack of accident" is relevant beyond proving character conformity. *See* Tex. R. Evid. 404(b); *Montgomery*, 810 S.W.2d at 377. We review a trial court's decision to admit or exclude evidence pursuant to Rule 404 under an abuse of discretion standard. *See Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003).

A party may present on appeal a complaint about improper evidence only if the record shows that (1) she timely and properly objected to the trial court and (2) the trial court (a) overruled the objection, either expressly or implicitly, or (b) refused to rule on the objection, and the party objected to the refusal. Tex. R. App. P. 33.1(a). Haynes did not make an objection at trial regarding the admission of the evidence about which she complains on appeal. Accordingly, Haynes did not preserve this complaint for appellate review. *Id*. Issue five is overruled.

Having overruled all issues, we affirm the judgment below.

AFFIRMED.

 

_____

LEANNE JOHNSON
Justice

Submitted on August 6, 2015
Opinion Delivered December 23, 2015

Before Kreger, Horton, and Johnson, JJ.